

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 1 2 2024

TAMMY H. DOWNS, CLERK

By:_____ DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | |
|---|---|
| **KENDRA BUCHANAN, SAMANTHA WALKER, BRITNEY SIPA and TAMAIKA OSBY,** individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br>v.<br><br>**EVOLVE BANK & TRUST**<br><br>    Defendant. | Case No. **4:24-cv-586-BSM**<br><br>**JURY TRIAL DEMANDED**<br><br><br>This case assigned to District Judge **Miller**<br>and to Magistrate Judge **Harris** |

## CLASS ACTION COMPLAINT

Plaintiffs Kendra Buchanan ("Buchanan"), Samantha Walker ("Walker"), Britney Sipa ("Sipa") and Tamaika Osby ("Osby"), (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Evolve Bank & Trust ("Evolve" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action against Defendant for failing to secure their systems and data from cyberattacks.

2.      Defendant Evolve is a bank. It accepts deposits, makes loans, and provides mortgage solutions, card facilities, and online banking services. Evolve serves clients in the United States. Evolve works with financial technology ("fintech") start-ups by providing banking

services to these start-ups' clients.

3.      On or about June 25, 2024, Evolve announced that a "known cybercriminal organization" stole its customers' personal identification information ("PII") and posted it on the dark web.

4.      As a result, millions of Evolve's customers lost their PII, and even more significantly, they have been locked out of their Evolve accounts, prevented them from accessing their funds to pay everyday expenses, thereby causing widespread harm and disruption. This action seeks to recover the losses sustained by Evolve customers as a result of losing their PII and also losing their inability to access their funds.

## PARTIES

5.      Plaintiff Buchanan is a natural person and citizen of Tennessee. Buchanan has been a customer of Defendant for a few years, by virtue of using a fintech app called Yotta, for whom Defendant provides banking services. She is currently unable to access her funds held by Defendant. The inability to access these funds affects Buchanan's ability to access her direct deposit pay in order to pay her monthly bills.

6.      Plaintiff Walker is a natural person and a citizen of Arkansas. Walker has been a customer of Defendant, also accessing her Evolve account through Yotta and Juno. She is currently unable to access her funds held by Defendant. The inability to access these funds affects Walker's ability to pay all of her bills including medical.

7.      Plaintiff Sipa is a natural person and a citizen of Arkansas. Sipa has been a customer of Defendant. She is currently unable to access her funds held by Defendant. The inability to access these funds affects Walker's ability to pay her bills.

8.      Plaintiff Osby is a natural person and a citizen of Tennessee. Osby had been a prior

2

customer of Defendant, prior to her mortgage being sold to another mortgage company. She received notice that her personal information had been compromised.

9.      Defendant Evolve is a bank headquartered in West Memphis, Arkansas.[1] Evolve wholly or primarily accepts deposits online, often through intermediary fintech apps which use Evolve as a banking services provider.

10.     Since the ransomware attack suffered by Defendant on June 25, 2024 ("Data Breach"), each of the Plaintiffs has been unable to access their funds held by Defendant.   This caused, and continues to cause, Plaintiffs to suffer significant monetary losses and other harms.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed $5,000,000.00, exclusive of interest and costs, and all conditions are met.

12.     This Court has jurisdiction over the Defendant as Defendant maintains its corporate headquarters in this District.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District and Defendant is headquartered in this district.

## GENERAL FACTUAL BACKGROUND

14.     Defendant Evolve is a bank.  It accepts deposits, makes loans, and provides mortgage solutions, card facilities, and online banking services. Evolve Bank serves clients in the United States.

15.     As a condition of receiving their services, Defendant requires that its customers

---

[1] Arkansas Secretary of State John Thurston, "Search Incorporations, Cooperatives, Banks and Insurance Companies", https://www.ark.org/corp-search/index.php/corps/results (last accessed on July 3, 2024).

entrust them with highly sensitive information, including their PII.

16.     On or about June 25, 2024, Evolve confirmed that it was the subject of a ransomware attack. The Data Breach was allegedly perpetrated by Lockbit ransomware gang. The bank confirmed that hackers "released illegally obtained data, including Personal Identification Information ("PII"), on the dark web."[2] "The data varies by individual but may include your name, Social Security Number, date of birth, account information and/or other personal information," the bank explained.[3]

17.     In its filing with the Securities and Exchange Commission ("SEC"), Affirm stated:[4]

> On June 25, 2024, Evolve Bank & Trust ("Evolve"), the third-party issuer of the Affirm Card, notified the Company that Evolve had experienced a cybersecurity incident whereby a third party gained ***unauthorized access to personal information and financial information ("Personal Information") of Evolve retail banking customers and the customers of its financial technology partners.*** Because the Company shares the Personal Information of Affirm Card users with Evolve to facilitate the issuance and servicing of Affirm Cards, the Company believes that the ***Personal Information of Affirm Card users was compromised as part of Evolve's cybersecurity incident.*** However, the Company's information systems were not compromised, nor was the ability for Affirm Card holders to continue using their Affirm Card. This incident has not impacted any other part of the Company's business or operations.
>
> Upon being notified of the Evolve cybersecurity incident, the Company immediately began an investigation independent of Evolve's investigation to determine whether any Affirm Card user Personal Information had been compromised, and that investigation, along with remediation efforts, is ongoing as of the date of this Current Report on Form 8-K (the "Filing"). Evolve has communicated to the Company that this cybersecurity incident has been contained. However, ***the full scope, nature and impact of the incident on the Company and Affirm Card***

---

[2] James Reddick, "Evolve Bank confirms data breach after brazen LockBit claims" (June 26, 2024), https://therecord.media/evolve-bank-data-breach-lockbit (last visited July 4, 2024).
[3] *Id.*
[4] Affirm Holdings, Inc., Form 8-K, dated June 25, 2024, https://www.sec.gov/Archives/edgar/data/1820953/000182095324000027/afrm-20240625.htm (last visited July 3, 2024.

*users, including the extent to which there has been unauthorized access to Affirm Card user Personal Information, are not yet known.* The Company has notified law enforcement and all Affirm Card users of the Evolve cybersecurity incident. Affirm Card users continue to be able to transact with their Affirm Cards, and the Company heightened its fraud monitoring. (Emphasis added).

18.    A number of fintech starts were affected by the Evolve Data Breach. Industry publication TechCrunch reported that, among others, fintech starts Branch, Earnln, Marqueta, Melio, Mercury, Yieldstreet and Wise were affected, and their customers' PII may have been stolen.[5]

19.    On its website, Defendant posted a statement, which acknowledges that Defendant was targeted in a ransomware attack, in which ransomware gang LockBit leaked its customers' PII. The statement reads, in part:

**What Happened**

In late May 2024, Evolve Bank & Trust identified that some of its systems were not working properly. While it initially appeared to be a hardware failure, we subsequently learned it was unauthorized activity. We engaged cybersecurity specialists to investigate and determined that unauthorized activity may have been the cause. We promptly initiated our incident response processes, stopped the attack within days, and have seen no new unauthorized activity since May 31, 2024. We engaged outside specialists to investigate what happened and what data was affected, as well as a firm to help us restore our services. We reported this incident to law enforcement.

While the investigation is ongoing, we want to share some important information about what we know so far. At this time, current evidence shows the following:

- ***This was a ransomware attack by the criminal organization, LockBit.***
- They appear to have gained access to our systems when an employee inadvertently clicked on a malicious internet link.
- There is no evidence that the criminals accessed any customer

---

[5] Lorenzo Franceschi-Bicchierai, "Yieldstreet says some of its customers were affected by the Evolve Bank data breach" TechCrunch (July 2, 2024), online: http://techcrunch.com/2024/07/02/yieldstreet-says-some-of-its-customers-were-affected-by-the-evolve-bank-data-breach/ (last accessed July 2, 2024).

> funds, but *it appears they did access and download customer information from our databases and a file share during periods in February and May.*
> - The threat actor also encrypted some data within our environment. However, we have backups available and experienced limited data loss and impact on our operations.
> - We refused to pay the ransom demanded by the threat actor. *As a result, they leaked the data they downloaded.* They also mistakenly attributed the source of the data to the Federal Reserve Bank. (Emphasis added.)

20.    Jason Mikula, a fintech reporter, wrote on June 20, 2024, that "The situation at Evolve Bank & Trust, which powers dozens of fintech programs with millions of end users, went from bad to worse last week." While Evolve was "still struggling to deal with the fallout from the bankruptcy and reconciliation issues linked to one-time banking-as-a-service partner Synapse", the bank was hit with "what may be one of the widest-reaching public data breaches in US history." Mr. Mikula reported that the Data Breach involved the exfiltration of some 33 terabytes of data, equivalent to some 2.8 billion pages of text.[6]

21.    Mr. Mikula noted that Evolve is "arguably the most prolific partner bank supporting fintech programs" and has "powered services or capabilities" for the following firms, all of which have likely lost their clients' PII in the Data Breach: Affirm, Airwallex, Alloy, Apto Payments, Asset Lab, 89, Bilt, BlockFi (bankrupt), Bond (BaaS platform acquired by FIS), Branch (powers instant payout and EWA programs for major business like Uber and Fetch and franchise operators of brands like Pizza Hut, Jimmy John's, and Dunkin Donuts), Brightside, Buffpay, Bushel Exchange, ByteFederal, Cadre, ChangeFi, Clearing, Dave, Deserve (credit card-as-a-service platform), Eamin', EquityZen, eusoh, Every, Extra, Finch Money, FloatMe, Flycoin, FTX (bankrupt), Gerald, Grid, GigWage, GloriFi (shutdown), GoChanged, GravyStack, Hightop, Juno,

---

[6] Jason Mikula, "Evolve Hack Crisis: Russia-Linked cybergang Leaks Records on Millions" *Fintech Business Weekly* (June 30, 2024), https://fintechbusinessweekly.substack.com/p/evolve-hack-crisis-russia-linked (last visited July 2, 2024.

Kyshi, Lumanu, Melio, Mercury, Nomad, Paceline, Palolo, PayGears, Paystand, PrideCard, PrizePool, Profit Business Bank, Qoins, RBR, RelayFi, Rho, Rollfi, Sail, Save, Series Financial, Shopify (via Stripe Treasury), Sila (payment processing platform), Sila, Solid (banking-as-a-service platform), SoLo Funds, Starlight, Status Money (shutdown), Step, Stilt (acquired by JG Wentworth), Stripe Treasury, Swype, Synapse (ongoing bankruptcy), TabaPay, TeamUP, Unbanked, Wise (until late 2023), YieldStreet, Yorbis, ZELF, and Zirtue.[7]

22.    Evolve's poor cybersecurity practices are long-standing and led to regulatory action against Defendant. The St. Louis Federal Reserve Bank and the Arkansas State Banking Department launched a "wide ranging enforcement action" against Evolve, stemming from their 2023 safety and soundness examination. The regulators noted that the enforcement action was independent of the still-unfolding bankruptcy of Evolve middleware partner Synapse. The enforcement action mandated "a plan and timetable to correct information technology security deficiencies."[8]

## RANSOMWARE THREATENS FINANCIAL SERVICES

23.    Ransomware is a subset of malware in which the data on a victim's computer, or network, is locked, typically by encryption, and where payment is demanded as a condition of providing the decryption key to unlock the encrypted data and once again make that data available to the victim.[9] The motive for ransomware attacks is nearly always monetary, and the demanded payment is almost always in some form of crypto-currency, typically Bitcoin.[10]

24.    Various forms of ransomware have been used to attack corporate as well as

---

[7] *Id.*

[8] Jason Mikula, "Evolve Hit with Fed Enforcement Action, But Why Did It Take This Long?" Fintech Business Weekly (June 23, 2024), https://fintechbusinessweekly.substack.com/p/evolve-hit-with-fed-enforcement-action (last visited July 3, 2024).

[9] Ransomware, http://searchsecurity.techtarget.com/definition/ransomware (last visited March 2, 2024).

[10] *Id.*

individual user systems since as early as 2013. The Cryptolocker strain of ransomware posed as a

Trojan horse (malware contained or incorporated within otherwise legitimate-seeming websites,

applications, or attachments to emails or messages). In 2017, the WannaCry ransomware attacked

and encrypted more than 300,000 Microsoft Windows systems globally, demanding payment in

Bitcoin in exchange for the data decryption key. WannaCry's mode of operation closely follows

ransomware's general methodology:

> When executed, the WannaCry malware first checks the "kill switch" domain
> name; if it is not found, then the ransomware encrypts the computer's data, then
> attempts to exploit the SMB vulnerability to spread out to random computers on
> the Internet, and "laterally" to computers on the same network. As with other
> modem ransomware, the payload displays a message informing the user that files
> have been encrypted, and demands a payment of around $300 in bitcoin within
> three days, or $600 within seven days.[11]

25.     Even where the extortionist's payment demand is relatively small (ranging between

hundreds of dollars to tens of thousands of dollars), the damage wreaked on enterprise and other

users' systems reaches hundreds of millions of dollars and more.

26.     Unlike a data breach, whose seriousness results from the exfiltration and criminal

usage of personally identifiable information, a ransomware attack renders data stored within a

computer network or individual computer both unreadable and completely inaccessible to the

enterprise or computer user.

27.     Accordingly, banks and financial services companies, such as the Defendant, are

especially attractive targets for ransomware.  A Conference of State Bank Supervisors document

warned that ***"[r]ansomware continues to present a major threat to the financial sector.*** This

method of attack used by bad actors has evolved from the basic encryption of data to now include

variations utilizing double and triple extortion, as well as distributed denial of service attacks

---

[11] WannaCry Ransomware Attack, https://en.wikipedia.org/wiki/WannaCry_ransomware_attack (last visited March
2, 2024).

(DDoS). For the financial sector, ransomware is much more than a financial issue of paying a ransom or a fee to recover stolen data. ***Ransomware also represents an operational threat and, in some instances, a threat to the very survival of the institution.***"[12]

28.     Other goods and services providers are not immune from ransomware attacks. In mid-2017, pharmaceutical giant Merck was the subject of the ransomware strain known as "NotPetya." Merck's business was brought to a virtual halt, and the cost to Merck, as of October 2017, amounted to more than $300 million, including more than $175 million in lost business,[13] with the costs to insurers having been estimated at $275 million.[14]

29.     It was widely known that ransomware attacks were a threat to banking and other financial services entities, in 2024. Indeed, the first ransomware attack was reported to occur in 1989.[15]

30.     LockBit ransomware gang, which allegedly attacked Defendant and caused the Data Breach, has been very well known for many years prior to the Data Breach.  According to Blackberry, "LockBit establishes control of a victim's system, collects network information, and achieves primary goals such as stealing and encrypting data. LockBit attacks typically employ a double extortion tactic to encourage victims to pay, first, to regain access to their encrypted files and then to pay again to prevent their stolen data from being posted publicly."[16]

---

[12] Conference of State Bank Supervisors, "Ransomware: Lessons Learned by Banks That Suffered an Attack", https://www.dob.texas.gov/sites/default/files/files/Bank-Trust-Companies/Ransomware-Lessons-Learned-Banks.pdf (last accessed July 3, 2024), emphasis added.

[13] Patrick Howell O'Neill, NotPetya Ransomware Cost Merck More than $310 Million, Cyber Scoop (Oct. 27, 2017), https://www.cyberscoop.com/notpetya-ransomware-cost-merck-310-million/ (last visited March 18, 2024).

[14] Reuters Staff, Merck Cyber Attack May Cost Insurers $275 Million: Verisk's PCS, Reuters (Oct. 19, 2017), https:/ /www .reuters.com/artic le/us-merck-co-cyber-insurance/merck-cyber-attack-may-cost-insurers-275-million-verisks-pcs-idUSKBN1CO2NP (last visited March 18, 2024).

[15] Nate Lord, A History of Ransomware Attacks: The Biggest and Worst Ransomware Attacks of All Time, Digital Guardian (Dec. 7, 2017), https://digitalguardian.com/blog/history-ransomware-attacks-biggest-and-worstransomware-attacks-all-time (last visited March 18, 2024).

[16] Blackberry, "What Is LockBit Ransomware?", https://www.blackberry.com/us/en/solutions/endpointsecurity/ ransomware-protection/lockbit (last accessed July 3, 2024).

31.     LockBit gang has Russian origins.  It maintains a dark web portal on The Onion Router, where it recruits talent and releases the data of victims held by companies who refuse to meet their demands.[17]

32.     LockBit ransomware has been implicated in more cyberattacks this year than any other ransomware, making it the most active ransomware in the world.  LockBit was first observed in September 2019.[18] It should not have come as a surprise to Defendant that LockBit ransomware gang would target it.  Yet, Defendant failed to take basic precautions to prevent the Data Breach.

## DEFENDANT FAILED TO COMPLY WITH FTC GUIDELINES

33.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[19]

34.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established cybersecurity guidelines for businesses.[20] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

35.     The FTC further recommends that companies not maintain PII longer than is

---

[17] *Id.*

[18] *Id.*

[19] Federal Trade Commission, *Start With Security, available at* https://www.ftc.gov/system/files/documents/plainlanguage/pdf1>205-startwithsecurity.pdf (last visited Aug. 24, 2020).

[20] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at* https://www.fie.gov/system/files/documents/plain-language/pdf-0136 protecting-personal-information.pdf (last visited Aug. 24, 2020).

needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

36.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

37.     Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

38.     Defendant was at all times fully aware of its obligation to protect the PII of its clients because of its position as a financial services provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

## PLAINTIFFS AND THE CLASS SUFFERED DAMAGES

39.     Plaintiffs and the Class are Defendant's customers. These customers may have engaged with Defendant directly, or through various fintech apps, such as Yotta, which use Defendant as their banking services provider.

40.     In their everyday practice, and as an integral part of their business, Plaintiffs and the Class place significant reliance on their ability to access their funds held by Defendant, and

---

[21] FTC, *Start With Security, supra* note 23.

11

transact with the Defendant.

41.     As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiffs and the Class suffered, and continue to suffer, economic damage and other actual harm, including monetary losses arising from inability to access their funds, together with expenses incurred in attempts to mitigate such business interruption and disruption.

42.     As of the date of the filing of this Complaint, Plaintiffs and the Class continue to experience significant business interruption and disruption as a direct and proximate result of their inability to, among others, access their own funds stored at Evolve. Defendant's wanton, willful, and reckless disregard caused a complete and total interruption of service, and further caused Plaintiffs and the Class monetary and other damages.

43.     Defendant failed to implement appropriate processes that could have prevented or minimized the effects of the LockBit ransomware attack.

44.     Plaintiffs acted in reasonable reliance on Defendant's misrepresentations and omissions regarding the security of its products and services, and would not have purchased Defendant's products and/or services had they known that Defendant did not take all necessary precautions to protect itself from cyberattack, including ransomware attacks. Plaintiffs and the Class would not have gone through with a purchase had they known that the use of Defendant's products was accompanied by an unreasonable risk of business disruption, interruption and monetary loss.

## **CLASS ACTION ALLEGATIONS**

45.     Plaintiffs seek relief in their individual capacity and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), (b)(3), and (c)(4), Plaintiffs seek certification of the following subclasses (together, the "Class"):

> All customers of located in the United States who were affected by

an interruption of service due to the ransomware attack which occurred on or about June 25, 2024.

46.     Excluded from the above Class are Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by any of Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the judges and court personnel in this case and any members of their immediate families.

47.     Numerosity. Fed. R. Civ. P. 23(a)(l). The members of the Class are so numerous that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time, Defendant provides services to millions of individual clients.

48.     Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a.  Whether Defendant failed to implement, monitor and audit adequate processes to timely detect, prevent, or mitigate a cyberattack;

b.  Whether Defendant's failures and omissions constitute a breach of contract;

c.  Whether Defendant's failures and omissions constitute negligence, or negligence *per se;*

d.  Whether adherence to FTC data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach;

e.  Which security procedures and which data-breach notification procedures should Defendant be required to implement as part of any injunctive relief ordered by the Court;

f.  Whether Defendant's acts and/or omissions in respect of the data-breach it suffered on or about June 25, 2024, caused financial harm to the Class Members;

g.  What the nature of the relief should be, including damages and/or equitable relief, to which Plaintiffs and the Class members are entitled.

49.  All members of the proposed Class are readily ascertainable. Defendant has access to the addresses and other contact information for members of the Class, which can be used for providing notice to many Class members.

50.  Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of those of other Class members because Plaintiffs were denied the ability to access their funds deposited with Evolve, like every other class member.

51.  Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including privacy litigation.

52.  Superiority of Class Action. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

53.  Damages for any individual class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

54.  Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2),

14

because Defendant has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## COUNT I - NEGLIGENCE AND NEGLIGENCE *PER SE*
(On Behalf of Plaintiffs and the Class)

55.     Plaintiffs repeat and fully incorporate all factual allegations contained in paragraphs 1 through 54 as if fully set forth herein.

56.     Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care to safeguard its systems and data from cyberattack, including ransomware attacks.

57.     More specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems and data storage architecture to ensure that Plaintiffs' and Class Members' PII was adequately secured and protected; (b) implementing processes that would detect an unauthorized breach of Defendant's security systems and data storage architecture in a timely manner; (c) timely acting on all warnings and alerts, including public information, regarding Defendant's security vulnerabilities and potential compromise of the PII of Plaintiffs and Class Members; (d) maintaining data security measures consistent with industry standards and applicable state and federal law; and (e) timely and adequately informing Plaintiffs and Class Members if and when a data breach occurred notwithstanding undertaking (a) through (d) above.

58.     Defendant had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs and class members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendant knew that

it was more likely than not Plaintiffs and other Class Members would be harmed by such theft statutes based upon the FTC Act that also created a duty. Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

59.     Defendant breached their duties by failing to implement, monitor, and audit the security of its data and systems, resulting in a ransomware attack that significantly impeded and/or prevented its clients' ability to conduct business.

60.     Neither Plaintiffs nor the Class contributed to the Data Breach as described in this Complaint.

61.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class suffered damages including, but not limited to, disruption and interruption of their ability to access their own funds.

62.     Defendant's acts and omissions as alleged herein were willful, wanton, and with reckless disregard for the rights of Plaintiffs and the Class.

63.     As a result of Defendant's negligence, and negligence *per se,* Plaintiffs and the Class suffered damages, including costs incurred as a result of business interruption and disruption, together with other damages as may be shown at trial.

## COUNT II - BREACH OF CONTRACT
(On Behalf of Plaintiffs and the Class)

64.     Plaintiffs incorporate the factual allegations contained in Paragraphs 1 through 54 as if fully set forth herein.

65.     Plaintiffs entered into contracts with Defendant.

66.     Defendant agreed to provide its specialized services m a professional and workmanlike manner. Implicit in performing these contractual duties is an obligation to

16

reasonably safeguard its systems and data from cyberattack, including ransomware attacks, which can cause an interruption in the flow of an enterprise's routine and everyday provision of services to its clients.

67.     Defendant breached its contracts with Plaintiffs and Class Members by failing to reasonably safeguard its systems and data from cyberattack, including ransomware attacks.

68.     As a direct and proximate result of Defendant's contract breaches, Plaintiffs sustained actual losses and damages including, but not limited to, complete interruption and disruption of their ability to access funds stored at Defendant's bank.

## COUNT III - UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

69.     Plaintiffs repeat and fully incorporate all factual allegations contained in paragraphs 1 through 54 as if fully set forth herein.

70.     Plaintiffs and the Class conferred a benefit on Defendant when they provided payment to Defendant for the sale of its products and services.

71.     In exchange for, and in consideration of, Plaintiffs and Class members providing payment for Defendant's products and services, Defendant was required to, and Plaintiffs and the Class expected Defendant to, implement reasonable security policies and procedures that would have detected, prevented, or mitigated a LockBit ransomware attack.

72.     As a result of Defendant's acts and omissions as alleged herein, Defendant has been unjustly enriched to the extent that any portion of such payments comprises spending for adequate security not provided.

## COUNT IV - CONVERSION
### (On Behalf of Plaintiffs and the Class)

73.     Plaintiffs repeat and fully incorporate all factual allegations contained in paragraphs

1 through 54 as if fully set forth herein.

74.     Plaintiffs, and each member of the Class, deposited money into accounts maintained by Defendant.

75.     Defendant knowingly and intentionally exercised control over the monies belonging to Plaintiffs and Class members, retraining funds and denying Plaintiffs and Class members access to their funds.

76.     Because of the unlawful restraint imposed by Defendant, the rights of Plaintiffs and the Class members in their funds were interfered with and their funds could not be used in the matter in which they desired.

77.     As a result of the foregoing actions of Defendant, Plaintiffs and the proposed Class have been damaged in an amount to be proven at trial.

## COUNT V – BREACH OF FIDUCIARY DUTY

### (On Behalf of Plaintiffs and the Class)

78.     Plaintiffs repeat and fully incorporate by factual allegations contained in paragraphs 1 through 54 as if fully set forth herein.

79.     Defendant owed a fiduciary duty to Plaintiffs and Class members to protect, secure and retain all monies that lawfully belonged to them.

80.     As alleged herein, Defendant breached those fiduciary duties by restraining funds that it had no right to restrain.

81.     Defendant breached those fiduciary duties by denying Plaintiffs and Class members access to the funds that lawfully belonged to them. Defendant breached those fiduciary duties by failing to secure and protect all of the funds Plaintiffs and Class members had in their Evolve accounts.

18

82.     As a result of the foregoing actions of Defendant, Plaintiffs and the proposed Class have been damaged in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

**WHEREFORE,** Plaintiffs, individually and on behalf of all Class members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.   For an Order certifying the Class as defined herein, and appointing Plaintiffs Buchanan, Walker, Sipa and Osby as class representatives, and appointing their counsel as counsel for the Class;

b.   For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to ransomware protection;

c.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

d.   For an award of actual damages, compensatory damages and nominal damages, in an amount to be determined;

e.   For an award of pre-judgment and post-judgment interest as allowed by law;

f.   For an award of costs of suit and attorneys' fees, as allowable by law; and

g.   Such other and further relief as this court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

Dated: July 12, 2024                        Respectfully submitted,

                                            **CARNEY BATES & PULLIAM, PLLC**

                                            Randall K. Pulliam (ABN 98105)
                                            Joseph Henry (Hank) Bates, III (ABN 98063)
                                            One Allied Drive, Suite 1400
                                            Little Rock, Arkansas 72202
                                            Telephone: (501) 312-8500
                                            rpulliam@cbplaw.com
                                            hbates@cbplaw.com

                                            **STECKLER WAYNE & LOVE PLLC**
                                            Bruce W. Steckler*
                                            12720 Hillcrest Road, Suite 1045
                                            Dallas, Texas 75230
                                            Telephone: (972) 387-4040
                                            Facsimile: (972) 387-4041
                                            bruce@swclaw.com

                                            *Pro hac vice forthcoming*

                                            ***Counsel for Plaintiffs and the Class***